Filed 8/12/14  P. v. Medeiros CA3

<u>**NOT TO BE PUBLISHED**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Lassen)

----

| | |
|---|---|
| THE PEOPLE, | C074419 |
| Plaintiff and Respondent, | (Super. Ct. No. CR030146) |
| v. | |
| DAVID FERNANDES MEDEIROS, | |
| Defendant and Appellant. | |

This case comes to us pursuant to the provisions of *People v. Wende* (1979) 25 Cal.3d 436, which requires us to review the entire record on appeal to determine whether there are any issues that arguably might benefit defendant David Fernandes Medeiros.  The trial court did not impose two mandatory fees at the time of sentencing; thus, we shall direct an amendment to the judgment and affirm the judgment as modified.

We provide the following description of the facts and procedural history of the case.  (See *People v. Kelly* (2006) 40 Cal.4th 106, 110, 124.)

1

A jury found defendant guilty as charged of assault with a firearm (Pen. Code, § 245, subd. (a)(2)—count IV)[1] and possession of a firearm by a convicted felon (§ 29800, subd. (a)(1)—count V). It found him guilty of petty theft (§§ 484, subd. (a), 490—count II) as a lesser included offense of burglary with personal discharge of a firearm, and it found him guilty of misdemeanor assault (§ 240—count VI) as a lesser included offense of assault by force likely to cause great bodily injury. The jury found defendant not guilty of burglary (§ 459—count I) and receiving stolen property (§ 496, subd. (a)—count III). He admitted that he had served seven prior prison terms. (§ 667.5, subd. (b).)

Defendant's motion for a new trial was denied. Defendant was sentenced to state prison for 11 years eight months and to jail for two concurrent terms of six months. In an amended abstract, he was awarded 295 days of custody credit and 294 days of conduct credit (Pen. Code, § 4019) and was ordered to pay a $280 restitution fine (*id.*, § 1202.4, subd. (b)) and a $280 restitution fine suspended unless parole is revoked (*id.*, § 1202.45). The trial court did not impose the mandatory $40 court operations fee (*id.*, § 1465.8, subd. (a)(1)) or the mandatory $30 court facilities assessment (Gov. Code, § 70373).

## FACTUAL BACKGROUND

### I. Count VI

#### A. *Prosecution Case-in-chief*

In July 2012, defendant was seen arguing with his girlfriend, Rachel Pascoe, near a restaurant parking lot. Witnesses saw defendant push Pascoe to the ground. He grabbed her hair and threw her down with so much force that her head hit the pavement.

---

[1] Undesignated statutory references are to the Penal Code.

Susanville Police Detective Richard Warner responded to calls regarding the assault. He contacted Pascoe and observed abrasions on her right shoulder, a scratch on her neck, and a hand print and bruises on her left arm.

Defendant spoke to Susanville Police Officer Kelley Merritt and claimed he had broken up a fight between Pascoe and another woman he refused to name. Defendant claimed he then picked Pascoe up from the ground and they began to argue.

### B. Defense

Defendant testified that he did not know Pascoe well at the time of the incident. He gave her a ride to a gas station and, after she left his truck, he noticed that his wallet was missing. Pascoe walked across the street. Defendant drove after her and parked in a restaurant parking lot. He stopped her when she tried to recross the street.

Defendant grabbed Pascoe's backpack and she sat down on the ground. He repeatedly tugged on the backpack, each time lifting Pascoe off of the ground.

Defendant and Pascoe returned to the truck as an acquaintance, Angie Smith, arrived. Pascoe and Smith began fighting. Smith testified that she argued with Pascoe and Pascoe hit her. An eyewitness who was acquainted with Smith testified that he saw Smith swing her fist at Pascoe. During the fight, defendant's wallet came out of Pascoe's shirt sleeve. Defendant picked up the wallet and broke up the fight.

### II. Counts I through V

### A. Prosecution Case-in-chief

In September 2012, the victim, Anthony Baxter, and his wife lived in Susanville with their son and Baxter's father. Their friend Ricky Davis occasionally would spend the night with the Baxters. Baxter occasionally sold marijuana to close friends in order to finance his own habit.

3

In late August 2012 a stranger appeared at the Baxters' apartment, introduced himself as Rocky, and asked to purchase marijuana. Baxter telephoned his supplier, Matt, and asked if Matt was interested in dealing with the stranger. Matt said that he was interested.

About two days later, Baxter and Matt met with Rocky and three or four associates. Matt brought along a pound of marijuana worth $2,000. Rocky and the associates robbed Baxter and Matt at gunpoint and took the marijuana.

Matt blamed Baxter, not the perpetrators, for the loss, and he demanded that Baxter reimburse him $2,000. Feeling responsible for Matt's loss, Baxter gave Matt a $2,500 laptop computer as collateral while he tried to pay the debt.

Baxter tried to sell several other possessions. His neighbors, James Brown and Michele Newkirk, knew a person who might be interested in purchasing some items. As a result, Baxter spoke twice to a "guy named Dave" about purchasing some archery bows, a motorized bicycle, and video games.

On September 8, 2012, Brown saw defendant and codefendant Chad Bernard Patton arrive at Baxter's apartment in defendant's white truck.[2] Defendant carried a crowbar as he and Patton approached. Newkirk directed them to Baxter's apartment.

At this point, Baxter's wife left the apartment to go to work. Her son and father-in-law went with her. Baxter was asleep in bed, and Davis was awake in the living room. Baxter's wife observed neighbors Brown and Newkirk conversing with defendant and Patton. Defendant was attempting to conceal "a long weapon" behind his back.

Defendant and Patton walked up the stairs to the Baxters' apartment. Defendant knocked on the door. Brown and Newkirk reentered their residence.

---

[2] Patton, a codefendant at trial, is not a party to this appeal.

4

Davis was in the Baxters' living room when he heard defendant knock. He opened the door and defendant immediately hit him with the crowbar. Defendant stepped inside the apartment, pointed a handgun at Davis, and told him to sit on the couch. Davis complied. Defendant began pointing out items in the apartment and telling Patton to take them down to the truck.

Davis observed defendant remove a cream-colored safe deposit box and a crossbow from a bedroom. Defendant returned to the bedroom and later reemerged with Baxter.

Baxter testified that when he awoke, he saw two men rifling through his closet. Defendant pointed a handgun at him. Baxter recognized defendant as the person to whom he previously had spoken about purchasing his archery bows, bicycle, and video games. Baxter heard defendant instruct Patton to take Baxter's archery bows and quiver of arrows. Patton carried the items out of the apartment. The motorized bicycle was taken from the kitchen.

While defendant and Patton were taking items to their truck, Brown stepped out of his apartment. He saw defendant, Patton, and Baxter carrying the archery bows, a bicycle, and a computer game to defendant's truck. Then Brown went back inside.

Defendant demanded $2,000 from Baxter and added that, when he came up with $2,000, he would be advised of the location of his stolen property.

As defendant was leaving, Baxter remarked, "It's a good thing I have surveillance in my house." Defendant turned and sprinted back up the stairs. Baxter closed and locked his door, but defendant kicked it in. Davis fled to Brown and Newkirk's apartment.

Defendant pointed his gun at Baxter and demanded the surveillance videotape. Baxter replied that he had been bluffing and that there was no surveillance. Defendant

5

told Baxter to sit. When he refused, defendant shot Baxter in the left leg from a distance of 18 to 20 inches. The bullet entered the leg slightly above the knee and lodged in the middle of the calf.

Baxter followed defendant as he left the apartment. Baxter saw defendant get into his truck and drive away. Then Baxter saw a hole in his pants. When he touched the hole, the pants became soaked with blood.

Later that day, Lassen County Sheriff's Sergeant Mike Carney went to an address on Court Street to look for suspects in the case. He immediately located defendant's pickup truck behind a dumpster in an alley. Shortly thereafter, Carney arrested Patton when he left the residence to walk some dogs. Later, Carney observed defendant in the back yard of a neighboring residence. He was taken into custody.

Patton's mother consented to a search of the basement of her residence. Detective Warner found a small cash box, a motorized bicycle and two archery bows. The officers looked for a gun but none was found.

The prosecution played audio recordings of seven telephone calls defendant placed from jail. The recordings were selected from 80 telephone calls defendant had placed.

In the recorded calls, defendant:

(1) told Pascoe to tell Brown that defendant was visiting Brown when they both heard a gunshot;

(2) told Pascoe to tell Brown that he did not know Baxter and was not at Baxter's apartment;

(3) suggested to Pascoe that Baxter had shot himself;

(4) asked Pascoe to send men to pressure Baxter so that Baxter would tell "the truth"; and

6

(5) told Pascoe that more than one person should go scare Baxter, because Baxter "wasn't afraid of [defendant] with the gun. [Baxter was] running his mouth. That's why he got shot."

### B. Defense

Defendant testified that in August 2012 he purchased a cellular telephone for Pascoe. Brown visited Pascoe's residence and stole the phone. Brown later admitted to defendant that he had the phone. In order to "make it up" to defendant, Brown told him that Baxter owed money to a drug dealer, evidently Matt, and was selling items to pay the debt.

Defendant talked to Baxter by phone. Baxter said he wanted to sell two bows, a motorized bicycle, and other items. Defendant spoke to the drug dealer, whom he refused to name. The drug dealer agreed to take the items from Baxter. Defendant was supposed to pick up the property and bring it to the drug dealer. In exchange, the drug dealer would allow defendant to use the dealer's steam cleaner to clean up a mess in defendant's truck.

Defendant and Patton went to the Baxters' apartment complex. When he parked, defendant saw Brown walking toward him. Because defendant saw a "seven-foot black dude coming at [him] aggressively," he retrieved a crowbar from the back of his truck. Defendant confronted Brown about the cell phone, and they had a heated conversation.

After defendant saw Baxter's family members leave, defendant went upstairs and he or Patton knocked on Baxter's door. Davis opened the door and talked with Patton. Defendant entered the apartment and told Davis that they were there to "to pick up that stuff [Baxter is] paying for his pound of weed with."

Davis went to the kitchen, opened a cabinet, took out a marijuana pipe and put it in his pocket. Davis removed an electronic scale and asked defendant if he wanted to buy it. But the duo tested the scale and determined it did not operate properly.

7

Davis and Patton took the motorized bicycle to defendant's truck. Before they returned, Baxter emerged from his bedroom. Defendant explained why he and Patton were there. Baxter said he thought the computer he had given to the drug dealer had satisfied his debt. Defendant advised Baxter to discuss the matter with the drug dealer.

Defendant observed bows and arrows near the front door and asked if they were supposed to go with the bicycle. Baxter did not respond. Defendant picked up the bows and gave them to Patton.

Baxter complained that he could not afford to pay bills or rent. Baxter added that " '[s]ome dude named Dave in a big white truck is coming to jack me." Defendant replied, "Whoa, whoa, whoa, I'm Dave in the big white truck."

As defendant was leaving, Baxter called defendant a punk. Defendant understood the term to refer to a person who submits to sodomy in prison. Enraged, defendant turned and rushed up the stairs. Baxter slammed the door in defendant's face.

Defendant kicked open the door and went inside. As he lunged toward Baxter, defendant saw Baxter pull out a gun. Defendant grabbed the barrel of the gun. As they struggled, the gun fired.

Defendant took the gun from Baxter and went to the doorway. As defendant walked out, Baxter said he had surveillance video. Defendant told Baxter to put the video on the Internet because it would show Baxter shot himself. Defendant, realizing he was still holding the gun by the barrel, threw it into a grass-covered area near the apartment. He returned to his truck and entered the passenger seat, and Patton drove away.

When asked about his telephone conversations with Pascoe from jail, defendant testified that he lied about being at Baxter's apartment because he was "trying to tell her

8

to tell people [he] wasn't at the scene." Defendant did so because he "didn't know what else to do."

Defendant testified that Baxter was "saying [defendant] tried to kill him," and defendant wanted Baxter to tell the truth. Defendant said there were other recorded conversations, which were not part of the prosecution evidence, in which he told Pascoe to "try and get people to tell the truth."

## DISCUSSION

We appointed counsel to represent defendant on appeal. Counsel filed an opening brief that sets forth the facts of the case and requests this court to review the record and determine whether there are any arguable issues on appeal. (*People v. Wende*, *supra*, 25 Cal.3d 436.) Defendant was advised by counsel of the right to file a supplemental brief within 30 days of the date of filing of the opening brief. We granted defendant's request for an extension until June 25, 2014, to file a supplemental brief. Thereafter we have received no communication from defendant.

Our review of the record discloses that the trial court did not impose the mandatory $40 court operations fee (Pen. Code, § 1465.8, subd. (a)(1)) or the mandatory $30 court facilities assessment (Gov. Code, § 70373). We modify the judgment to include these two items.

The probation report indicates defendant was booked on September 8, 2012. He was sentenced on July 24, 2013. If defendant was in custody the entire time, he would be entitled to 320 days of custody credit, not the 295 days he was awarded. The record does not reflect that defendant was released for some portion of this time. We direct the trial court to recalculate and confirm the number of actual days defendant spent in custody.

Having undertaken an examination of the entire record, we find no arguable error that would result in a disposition more favorable to defendant.

9

## DISPOSITION

The judgment is modified to impose a $40 court operations fee and a $30 court facilities assessment.  The trial court is directed to recalculate and confirm defendant's presentence credits.  As so modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


                                                       _____BUTZ_____, J.


We concur:


_____RAYE_____, P. J.


_____DUARTE_____, J.